The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KEITH WALKER, individually, and as parent and guardian for D.W., a minor, and CLEMENCIA WALKER,

Plaintiffs,

v.

KING COUNTY, a municipal corporation, acting through the KING COUNTY SHERIFF'S OFFICE, and MARYLISA PRIEBE-OLSON, and PAUL AIO, and the STATE OF WASHINGTON, by and through its agency, CHILD PROECTIVE SERVICES, and EDGAR DUBOSE,

Defendants.

Case No. C08-0549-JCC

ORDER

This matter comes before the Court on King County Defendants' ("Defendants") Motion for Qualified Immunity and for Summary Judgment (Dkt. No. 33), Plaintiffs' Response (Dkt. No. 46), and Defendants' Reply (Dkt. No. 51). Having thoroughly considered the parties' briefing, declarations, and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS IN PART and DENIES IN PART the motion for the reasons explained herein.

//

ORDER
PAGE - 1

## I.  BACKGROUND

This case stems from a custody dispute between Plaintiff Keith Walker and his former partner, Kamla Patton, over their son, D.W. (*See* Dubose Decl. ¶ 9 (Dkt. No. 39).) Ms. Patton originally had custody over D.W., but after numerous investigations by Child Protective Services ("CPS") into allegations of neglect and substance abuse, Mr. Walker obtained custody in 2003. (*See id.*; K. Walker Dep. 75 (Dkt. No. 48-3); *see generally* K. Walker Dep. 57–77 (Dkt. No. 48-3).) Before the incident at the heart of this case, thirteen allegations of abuse and neglect had been made against Ms. Patton. (*See* Dubose Decl. ¶ 9 (Dkt. No. 39).) Ms. Patton appears to have also made several unfounded allegations concerning Mr. Walker's parenting. (*See id.*) Before the relevant incident, CPS had received nine allegations concerning Mr. Walker; CPS investigated four of these allegations, three of which were determined to be unfounded and one of which was determined to be inconclusive. (*See id.*; 6/28/05 CPS Referral 4 (Dkt. No. 48-14).)

On June 28, 2005, Ms. Patton called CPS to allege that Mr. Walker had choked D.W. and had threatened him with a gun. (6/28/05 CPS Referral 3 (Dkt. No. 48-14).) CPS designated the referral with a risk tag "moderate" (*id.* at 2), which is the lowest level of referral that requires a social worker to make contact with the child (Dubose Decl. ¶ 7 (Dkt. No. 39)). In explaining the risk assessment, the referral noted that there were "[n]o founded CPS priors on father" and that the findings as to the remaining allegation had been inconclusive. (6/28/05 CPS Referral 6 (Dkt. No. 48-14).) In fact, Ms. Patton had made an extremely similar allegation back in February 2003, when she claimed that Mr. Walker had a gun and threatened to kill D.W. (*See* Intake Summary Report 8 (Dkt. No. 48-9 at 9).)

On June 30, two days after receiving the report, CPS assigned a social worker named Edgar Dubose to investigate the allegations that Mr. Walker had abused D.W. (Dubose Decl. ¶ 8 (Dkt. No. 39).) Later that day, sometime before 2:22pm, Mr. Dubose contacted Officer Marylisa Priebe-Olson, a Detective with the King County Sheriff's Office, to seek her help in

investigating the allegations. (6/28/05 CPS Referral 8 (Dkt. No. 48-14); Priebe-Olson Decl. ¶¶ 1–2 (Dkt. No. 36 at 1–2).) Mr. Dubose and Officer Priebe-Olson discussed the case, and they agreed to visit Mr. Walker's home together at 10:00am the following morning. (6/28/05 CPS Referral 8 (Dkt. No. 48-14).) Mr. Dubose was familiar with the previous unfounded allegations made by Ms. Patton against Mr. Walker (Dubose Decl. ¶ 9 (Dkt. No. 39), and he appears to have discussed with Officer Priebe-Olson both the ongoing custody dispute and Ms. Patton's history of making unfounded referrals. (Priebe-Olson Dep. 13:9–14:1, 19:18–19:22 (Dkt. No. 48-5 at 4–5).) In preparing for the visit, Officer Priebe-Olson checked Mr. Walker's criminal history and discovered that he had previously been convicted of a felony. (*Id.* at 14:23–15:3.)

The following day, Mr. Dubose met Officer Priebe-Olson and Officer Paul Aio at Mr. Walker's home. (Dubose Decl. ¶ 12 (Dkt. No. 39 at 4).) At this point, the parties' accounts of the events diverge sharply. Mr. Walker claims that, as soon he opened the door, the officers barged into the home, started asking him questions, and demanded that D.W. be interviewed alone (K. Walker Dep. 7:18–9:10, 9:21–10:9 (Dkt. No. 48-3 at 3); K. Walker Decl. ¶ 2 (Dkt. No. 47 at 2) ("I never gave them permission to enter my apartment. I never gave them permission to remain.").[1]) The officers, on the other hand, claim that Mr. Walker invited them into the home and cordially arranged for D.W. to speak to Mr. Dubose in a bedroom. (Aio Decl. ¶ 3 (Dkt. No. 43); Priebe-Olson Dep. 21:17–21:25 (Dkt. No. 48-5 at 5).) The parties

---

[1] In their reply, Defendants move to strike Mr. Walker's declaration on the grounds that it "is not made under penalty of perjury under the laws of the State of Washington." (Reply 8 (Dkt. No. 51).) Although Mr. Walker's declaration fails to comply with the technical requirements set forth in 28 U.S.C. § 1746, the Court will nonetheless consider it for the purpose of deciding this motion because the declaration primarily repeats, in more convenient form, the information to which Mr. Walker testified in his sworn deposition. *See Staples v. Dep't of Soc. & Health Servs.*, C07-5443-RJB, 2009 WL 442074, at *6 (W.D. Wash. Feb. 17, 2009) (accepting an identically deficient declaration for the purpose of deciding a summary judgment motion on the merits).

ORDER
PAGE - 3

agree that, in his interview with Mr. Dubose, D.W. denied the allegations that he had been threatened or choked by his father; however, D.W. did divulge that his father had a gun in the house. (Dubose Decl. ¶ 24 (Dkt. No. 39 at 6).) Mr. Dubose relayed this information to Officer Priebe-Olson, who then confronted Mr. Walker about the firearm, which he could not legally possess as a convicted felon. (Priebe-Olson Dep. 30:6–30:12 (Dkt. No. 48.5 at 7).) Mr. Walker had previously told Officer Priebe-Olson that he did not own a gun (K. Walker Dep. 14:17–14:18 (Dkt. No. 48-3 at 5)), but, after being confronted, he apparently explained that the gun belonged to his then-girlfriend, and current wife, Clemencia.[2] (Priebe-Olson Dep. 33:16–33:24 (Dkt. No. 48-5 at 7).) Officer Priebe-Olson allegedly explained that his handling the gun, even if it belonged to Mrs. Walker, still constituted "possession" (*id.* at 44:2–44:7), and she arrested Mr. Walker for being a convicted felon in possession of a firearm (Priebe-Olson Decl. ¶ 8 (Dkt. No. 36 at 4); K. Walker Dep. 17:21–24 (Dkt. No. 48-3 at 5)).

At this point, the parties against disagree about how the events unfolded. Officer Priebe-Olsen claims that Mr. Walker disclosed that the gun was in his bedroom and consented, in principle, to her removing it; however, because it was Mrs. Walker's firearm, he allegedly wanted to wait until she returned. (Priebe-Olsen Dep. 33:16–33:24, 45:24–46:2 (Dkt. No. 48-5 at 7–9).) According to this version of the events, Mrs. Walker was apologetic when she arrived and willingly retrieved the firearm for Officer Priebe-Olson. (*Id.* at 46:7–47:5.) In contrast, Mr. Walker denies ever having consented to a search of his home for the weapon, instead insisting that he speak with his attorney. (K. Walker Decl. ¶ 3 (Dkt. No. 47 at 3); K. Walker Dep. 18:18 (Dkt. No. 48-3 at 6).) Both Mr. and Mrs. Walker allege that Officer Priebe-Olson grabbed Mrs. Walker as soon as she entered the apartment and ordered her to produce the gun, which she

---

[2] Mrs. Walker was apparently named "Clemencia Jackson" at the time of the events in question (*see* Mot. 4 (Dkt. No. 33)), but the Court will refer to her as "Mrs. Walker" for simplicity.

ORDER
PAGE - 4

did. (K. Walker Dep. 30:20–30:22 (Dkt. No. 48-3 at 9); C. Walker Dep. 33:24–25 (Dkt. No. 48-4 at 4).)

Ms. Patton had been scheduled to pick up D.W. for a court-approved visitation at noon that day. (K. Walker Dep. 23:16–23:17 (Dkt. No. 48-3 at 7).) Because Mr. Walker was being arrested and Mrs. Walker had to return to work, Officer Priebe-Olson decided that Ms. Patton should pick D.W. up a few hours early. (Priebe-Olson Decl. ¶ 9 (Dkt. No. 36 at 5).) She claims that "Mr. Walker consented to this logical and appropriate plan" (*id.*), but Mr. Walker denies ever consenting to D.W.'s early pickup (*see* K. Walker Decl. ¶ 5 (Dkt. No. 47 at 4) ("I did not give permission for D.W. to be taken from my apartment.").)

On February 21, 2008, Mr. Walker filed this action in state court against King County and its Sheriff's Office, Officers Priebe-Olson and Aio, the State of Washington and its CPS agency, and Mr. Dubose, alleging a variety of state and federal law claims. (Compl. 1, 19–22 (Dkt. No. 1 at 7, 26–28).) The King County Sheriff's Office, Officer Priebe-Olson, and Officer Aio (collectively "King County Defendants" or "Defendants") removed to federal court (Dkt. No. 1 at 1) and have moved for summary judgment on qualified immunity grounds (Dkt. No. 33).[3] In opposition to the summary judgment motion, Plaintiffs allege five claims for which they argue summary judgment should be denied: (1) illegal entry of Mr. Walker's home in violation of the Fourth Amendment, (2) illegal arrest of Mr. Walker in violation of the Fourth Amendment, (3) illegal search of Mr. Walker's home in violation of the Fourth Amendment, (4) removal of D.W. from Mr. Walker's home in violation of the Fourth and Fourteenth Amendments, and (5) negligent investigation in violation of state law. (Resp. (Dkt. No. 46).)

//

//

---

[3] Plaintiffs have reached a tentative settlement with the State of Washington, CPS, and Mr. Dubose. (Dkt. No. 45.) Those parties are currently seeking court-approval of the proposed settlement. (*See* Mot. for Approval of Minor Settlement (Dkt. No. 52).)

ORDER
PAGE - 5

## II. DISCUSSION

Under Federal Rule of Civil Procedure 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the [moving party] is entitled to judgment as a matter of law." A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *In re Caneva*, 550 F.3d 755, 761 (9th Cir. 2008) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Id.*

Qualified immunity protects state governmental officials from suit under 42 U.S.C. § 1983 "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The qualified immunity analysis consists of two prongs: First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, was the constitutional right "clearly established" at the time of Defendants' misconduct? *Id.*; *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (explaining that a right is "clearly established" if the law at the time gave the defendants "fair warning that their [conduct] was unconstitutional."). The Supreme Court recently held that a district court may consider these two prongs in either order depending on the circumstances of the case at hand. *Pearson*, 129 S. Ct. at 818.

### A. Entry into Mr. Walker's Home

The Fourth Amendment prohibits "unreasonable searches and seizures." *See* U.S. CONST. amend. IV. A search is generally "unreasonable" unless supported by both (1) a warrant and (2) probable cause to believe the search will uncover evidence of a crime, yet there are several exceptions to this general rule. *See Mincey v. Arizona*, 437 U.S. 385, 390 (1978).

Defendants concede that the entry into Mr. Walker's home constituted a "search" within the meaning of the Fourth Amendment and that this search was conducted without a warrant. (*See* Mot. 8–9 (Dkt. No. 33).) On the other hand, Plaintiffs agree that the warrantless entry into Mr. Walker's home would have been valid if, as Defendants allege, Mr. Walker consented to their entry and invited them into the apartment. (*See* Resp. 9 (Dkt. No. 46).) Here, however, the Court must view the evidence in the light most favorable to Plaintiffs, and Defendants concede that "there is an issue of fact as to whether Mr. Walker consented to the entry." (Mot. 8 (Dkt. No. 33).) Therefore, in deciding whether a genuine issue of material fact exists as to the lawfulness of the officers' entry into Mr. Walker's home, the Court must accept Plaintiffs' account as true.

Defendants argue that the entry was lawful even without Mr. Walker's consent because the visit constituted a valid warrantless "welfare check." (Mot. 8–10 (Dkt. No. 33).) Defendants note that the "exigencies" of a situation can render a warrantless search objectively reasonable, and that "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury . . . ." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). However, the exception to the warrant requirement described in *Brigham City* only applies when police "have an objectively reasonable basis for believing that an occupant is seriously injured or *imminently* threatened with such injury." *Id.* at 400. In this case, there clearly was no such imminent threat of injury. The officers arrived at Mr. Walker's home three days after Ms. Patton reported the alleged abuse to CPS and over twenty hours after Officer Priebe-Olson herself had been informed of the accusations. (6/28/05 CPS Referral 2, 8–9 (Dkt. No. 48-14).) Officer Priebe-Olson testified in her deposition that it would generally take "an hour and a half to six hours" to obtain a warrant, but no attempt was made to do so even though there was ample time. (Priebe-Olson Dep. 49 (Dkt. No. 48-5 at 9).) Moreover, CPS had designated the referral only as "moderate risk" (6/28/05 CPS Referral 6 (Dkt. No. 48-14)), and Officer Priebe-Olson knew that Ms. Patton had a history of leveling

unfounded allegations of abuse against Mr. Walker (Priebe-Olson Dep. 13:9–14:1, 19:18–19:22, 81:10–81:22 (Dkt. No. 48-5 at 4, 5, 11)). Finally, Officer Priebe-Olson concedes that when they approached the house, she saw D.W. watching TV and "'c[ould] see that he[ wa]s fine'" (Priebe-Olson Dep. 21:17 (Dkt. No. 48-5 at 5)), undermining any claim that they feared D.W. was "seriously injured or *imminently* threatened with such injury." *Brigham City*, 547 U.S. at 400. Under these circumstances, no reasonable officer could conclude that exigencies justified a warrantless, non-consensual entry into Mr. Walker's home.

Defendants next argue that they are entitled to qualified immunity because "as of July 1, 2005, there was no 'clearly established' federal case law on the exact contours of the right." (Mot. 11 (Dkt. No. 33).) However, the constitutional right at issue in this case is the fundamental Fourth Amendment guarantee not to have one's home subjected to an "unreasonable" search, a right established long before 2005. *Silverman v. United States*, 365 U.S. 505, 511 (1961) ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."). The relevant question for qualified immunity purposes is not whether the "exact contours of the right" were absolutely defined (an impossible standard by any means), but instead whether there existed some ambiguity in the case law to render the officers' conduct arguably reasonable. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). Defendants note that the *Brigham City* case, which was decided after the warrantless entry into Mr. Walker's home, resolved certain "differences among state courts and the Courts of Appeals concerning the appropriate Fourth Amendment standard governing warrantless entry by law enforcement in an emergency situation." 547 U.S. at 402. Yet the circuit split that predated *Brigham City* bears no relevance to facts of this case. In that case, the Supreme Court noted that some lower courts applied the "emergency aid" exception whenever the circumstances *objectively* justified warrantless entry, whereas other courts also considered the officers' *subjective* motivations, *see id.* at 404, yet it was clear that either test required "an injured occupant or . . . [threat of]

ORDER
PAGE - 8

imminent injury." *Id.* at 403. Because there was absolutely no "emergency" in this case, the "emergency aid" exception would not justify the warrantless entry of Mr. Walker's home under either formulation; therefore, the circuit split resolved in *Brigham City* does not entitle the officers to qualified immunity.

Finally, Defendants claim that "[l]ongstanding Washington case law regarding the 'welfare check' exception also provides clear direction to officers to assist people that the officers perceive may be in danger, even where there is not an immediate emergency." (Mot. 9 (Dkt. No. 33).) To support this broad assertion, Defendants cite a single case from the state court of appeals. *See State v. Gocken*, 857 P.2d 1074 (Wash. Ct. App. 1993). In *Gocken*, the state court does appear to recognize an exception to the warrant requirement independent from the "emergency aid" exception described above. *See id.* at 1080 ("[T]he police may be required to perform a warrantless search, *not as a response to an immediate emergency*, but as part of their function of protecting and assisting the public." (emphasis added).) However, the Court explicitly limited this new exception for "health and safety" checks "to *circumstances in which there is no probable cause to suspect a crime is being or has been committed*." *Id.* at 1080 n.6. In this case, the only reason that Officers Priebe-Olson and Aio had to suspect that D.W.'s "health and safety" might be threatened was the allegation that he had been *assaulted* by his father; therefore, any investigation into D.W.'s safety would necessarily be an investigation into whether or not Mr. Walker had committed a criminal act. By its own clear terms, therefore, the "health and safety" exception described in *Gocken* would not apply to the facts of this case.

The relevant case law on July 1, 2005, clearly put Officers Priebe-Olson and Aio "on notice" that, without a substantial threat of imminent harm to D.W., a warrantless, non-consensual search of Mr. Walker's home could not be justified. Because there are genuine issues of material fact as to Mr. Walker's consent, the Court DENIES summary judgment as to Plaintiffs' claim that the initial entry into the apartment violated the Fourth Amendment.

### B. Mr. Walker's Arrest

Although warrantless arrests in public places are generally allowed, *see United States v. Watson*, 423 U.S. 411, 417 (1976), the Fourth Amendment requires that an arrest *inside a home* be supported by a warrant unless exigent circumstances existed or the officers had some other lawful reason to be inside the property, *see Payton v. New York*, 445 U.S. 573, 590 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house."). The parties agree, correctly, that the analysis regarding the lawfulness of Mr. Walker's warrantless arrest is identical to that of the warrantless entry into his home. (Resp. 18–22 (Dkt. No. 46); Reply 2 n.1 (Dkt. No. 51).) Therefore, because the officers in this case had neither an arrest warrant, nor a warrant to search the apartment, nor a lawful justification for warrantless entry (assuming, again, that Mr. Walker did not consent), the Court DENIES summary judgment as to Plaintiffs' claim that Mr. Walker's arrest in his apartment violated the Fourth Amendment.

### C. Search of Mr. Walker's Apartment

Plaintiffs claim that Defendants again violated the Fourth Amendment when Office Priebe-Olson ordered Mrs. Walker to show her where the gun was located. (*See* C. Walker Dep. 33:24–33:25 (Dkt. No. 48-4 at 4).) Defendants argue that the search was reasonable for two alternative reasons: (1) even under Mr. and Mrs. Walker's account of the events, an officer could reasonably believe that they had consented to the search, and (2) the search was necessary to confiscate the firearm in order to protect the remaining occupants of the apartment. (*See* Mot. 15–16 (Dkt. No. 33).) Neither of Defendants' claims has merit.

In support of their contention that Mr. and Mrs. Walker might have consented to the search, Defendants point to the following passage in Mrs. Walker's deposition:

Q: Did you at any time indicate that she couldn't search your room?

A: No.

Q: Did you have any problem with her at that point searching your room for a gun?

A: I didn't even know what my rights is [sic].

(C. Walker Dep. 39:10–39:15 (Dkt. No. 48-4 at 6).) However, in the same deposition, Mrs. Walker indicated that Officer Priebe-Olson never asked her permission to search the room (*id.* at 39:6–39:9); instead, she "grabbed" Mrs. Walker and said, "'I need for you to show me where the gun is'" (*id.* at 33:24–33:25). Defendants have failed to identify, and the Court's research has failed to produce, any case suggesting that the mere silent acquiescence to an officer's direct order could be sufficient to infer consent. *Cf. Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1017 (9th Cir. 2008) ("We have sustained an inference of consent . . . only under very limited circumstances—i.e., where the officers have verbally *requested* permission . . . and the occupant's action suggests assent . . . or where prior collaborative interactions between the suspect and the officers make the inference of consent *unequivocal*." (emphasis added)). Accordingly, the Court finds that, viewing the facts in the light most favorable to Plaintiffs, no reasonable officer could have concluded that the search for the gun was consensual.

As to their second contention, Defendants note that a family friend was staying in the apartment with her two toddlers. (Mot. 16 (Dkt. No. 33); Ms. Walker Dep. 29:1–29:19 (Dkt. No. 48-4 at 3).) Defendants quote a single district court case for the proposition that the "'decision to find and secure the weapon[] was reasonable to prevent harm to the occupants that might have ensued once the defendant officers departed . . . .'" (Mot. 16 (Dkt. No. 33) (*quoting Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 344–45 (E.D.N.Y. 2006)).) However, in *Ostroski*, the Court explicitly relied on the "emergency aid" exception to the warrant requirement and explained that, at the time of the seizure, the two occupants of the residence were in the middle of "a heated domestic dispute." 443 F. Supp. 2d at 344–45. The Court held that "the search and seizure was reasonable under the emergency aid doctrine because the officers reasonably believed that it was necessary to protect the occupants of the residence from *imminent* injury." (*Id.* (*citing Brigham City*, 547 U.S. 398) (emphasis added).) In this case, there was absolutely nothing to suggest an imminent threat of harm to the toddlers, who were staying in the apartment under the supervision of their mother. (Ms. Walker Dep.

ORDER
PAGE - 11

29:1–29:19 (Dkt. No. 48-4 at 3).) Defendants cannot seriously contend that the mere presence of a firearm in a home with children is sufficient to justify a warrantless search of the property.

Viewing the facts in the light most favorable to Plaintiffs, Officer Priebe-Olson clearly violated the Fourth Amendment by ordering Mrs. Walker to lead her to the firearm in the bedroom. Accordingly, the Court DENIES summary judgment as to Plaintiffs' claim that the search for the weapon was unconstitutional.

### D. Removal of D.W. from the Apartment

Plaintiffs further claim that Defendants violated their rights of familial association under the Fourth and Fourteenth Amendments by arranging for Ms. Patton, D.W.'s mother, to pick him up early in light of Mr. Walker's arrest. (Resp. 22–23 (Dkt. No. 46).) As Plaintiffs note, the Ninth Circuit has recognized that "'[p]arents and children have a well-elaborated constitutional right to live together without governmental interference.'" *Rogers v. County of San Joaquin*, 487 F.3d 1288, 1295 (9th Cir. 2007) (*quoting Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000)). Accordingly, "[t]he Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies." *Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107 (9th Cir. 2007); *see also Ram v. Rubin*, 118 F.3d 1306, 1310 (9th Cir. 1997) ("[A] parent ha[s] a constitutionally protected right to the care and custody of his children and . . . he c[an]not be summarily deprived of that custody without notice and a hearing, except when the children [a]re in imminent danger.")

The cases upon which Plaintiffs rely each involve the extended removal of a child into the government's protective custody pending a child abuse investigation, *see Rogers*, 487 F.3d at 1291, 1294 (concerning a two-week removal from parental custody); *Mabe*, 237 F.3d at 1105 (concerning a four-year period of non-parental custody); *Wallis*, 202 F.3d at 1131 (concerning a two-and-one-half-month removal from parental custody; *Ram*, 118 F.3d at 1310 (concerning a four-day period of protective custody), and it is not at all clear that their

ORDER
PAGE - 12

reasoning would apply to the facts of this case. Here, Mr. Dubose, Officer Priebe-Olson, and Officer Aio met at Mr. Walker's home at 10:00am on July 1, 2005. (6/28/05 CPS Referral 8 (Dkt. No. 48-14).) Ms. Patton was scheduled to pick up D.W. for a court-appointed visitation at noon on that same day. (K. Walker Dep. 23:16–23:17 (Dkt. No. 48-3 at 7).) Because Mr. Walker was being taken into custody on criminal charges and Mrs. Walker was going back to work, the officers felt that it would be prudent to have Ms. Patton pick up D.W. early. (Priebe-Olson Decl. ¶ 9 (Dkt. No. 36 at 5).) In light of the fact that D.W. was going to be separated from Mr. and Mrs. Walker for those few short hours either way, it is difficult to see how the police officers' arrangement of an early pickup implicated the constitutional rights of "[p]arents and children . . . to *live together* without governmental interference" and to "not be *separated* . . . without due process of law." *See Rogers*, 487 F.3d at 1294 (emphasis added) (internal quotations omitted). Even viewing the evidence in the light most favorable to Plaintiffs, the Court cannot say that the officers' conduct violated a "clearly established" constitutional right. Accordingly, Defendants are entitled to qualified immunity and the Court GRANTS summary judgment as to Plaintiffs' claim that the early removal of D.W. from the apartment violated the Fourth and Fourteenth Amendments.

### E. Negligent Investigation

Plaintiffs finally claim that Defendants are liable for negligent investigation under Washington state law. (Resp. 23 (Dkt. No. 46).) Washington Revised Code 26.44.050 provides that "[u]pon the receipt of a report concerning the possible occurrence of abuse or neglect, the law enforcement agency or the department of social and health services must investigate and provide . . . a report . . . ." The Washington Supreme Court has interpreted this statute to impose a "mandated duty to investigate child abuse allegations" and has held that children and their parents can bring negligent investigation claims to remedy breaches of this duty of care. *See Tyner v. Wash. Dep't of Soc. & Health Servs.*, 1 P.3d 1148, 1153, 1154–55 (Wash. 2000). Plaintiffs argue that Defendants are liable for negligent investigation because the officers

"entered [Mr. Walker's] home, arrested Mr. Walker in front of his son, removed D.W. from his father's home, and gave him to [Ms.] Patton." (Resp. 24 (Dkt. No. 46).)

Even viewing the evidence in the light most favorable to Plaintiffs, they have failed to make out a claim for negligent investigation. The Washington Supreme Court has rejected the notion of a "general statutory duty of care" for child abuse investigations and has severely limited the scope of the duty to investigate:

> [A] claim for negligent investigation . . . is available only to children, parents, and guardians of children who are harmed because [the investigating party] has *gathered incomplete or biased information* that results in a *harmful placement decision*, such as removing a child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home.

*M.W. v. Dep't of Soc. & Health Servs.*, 70 P.3d 954, 959, 960 (Wash. 2003) (emphasis added). Plaintiffs' claim fails in two respects: (1) the officers' actions did not result in a "harmful placement decision," and (2) any harm that Plaintiffs endured did not result from the officers "gather[ing] incomplete or biased information" over the course of their investigation.

Plaintiffs try to argue that turning D.W. over to his mother was a "harmful placement decision" because Ms. Patton subsequently refused to return D.W. after her scheduled visit was complete. (Resp. 24 (Dkt. No. 46); K. Walker Decl. ¶ 6 (Dkt. No. 47).) Plaintiffs also allege that Mr. Dubose and CPS played a role in keeping D.W. with his mother. (K. Walker Dep. 41:21–45:25 (Dkt. No. 48-3 at 10–11).) However, even if these allegations are true, Plaintiffs fail to make any connection between this subsequent dispute and the original decision by Officers Priebe-Olson and Aio to arrange for Ms. Patton to pick up D.W. a few hours early. Ms. Patton was scheduled to collect D.W. at noon on the day of Mr. Walker's arrest, and nothing suggests that the resulting custody dispute would have been avoided had Ms. Patton waited two hours and picked him up at the originally scheduled time.

Moreover, none of the officers' allegedly negligent acts involved faulty gathering of information. The Court has found genuine issues of material fact as to whether certain of the officers' actions should have been supported by warrant, and, if confirmed, these actions might

constitute serious Fourth Amendment violations; however, the state supreme court has refused to extend liability to all negligent conduct in the course of an investigation. *See M.W.*, 70 P.3d at 956. Instead, parties are liable only for harms that result from gathering *incomplete or biased* information. *Id.* at 960. In this case, the officers were presented an allegation of abuse, and although that allegation did not justify a warrantless entry into Mr. Walker's home, it certainly justified some form of investigation. In the course of that investigation, D.W. disclosed that Mr. Walker had been handling a firearm, which gave the officers probable cause to arrest him as a felon in possession. (*See* Resp. 19 (Dkt. No. 46) (conceding probable cause for the arrest).) Had the officers confronted Mr. Walker and D.W. in public, the same investigation would not have raised Fourth Amendment concerns and would have been beyond reproach. *See Payton*, 445 U.S. at 590. Therefore, even if Mr. Walker's arrest did contribute indirectly to his subsequent difficulty in retrieving his son from Ms. Patton, that harm is not actionable under a theory of negligent investigation because his arrest was not based on incomplete or biased information. Accordingly, the Court GRANTS summary judgment as to Plaintiffs' claim of negligent investigation.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt. No. 33) is DENIED as to Plaintiffs' Fourth Amendment claims of unlawful entry, unlawful arrest, and unlawful search, but the motion is GRANTED as to Plaintiffs' claims of removal without due process and negligent investigation.

DATED this 18th day of June, 2009.

John C. Coughenour
United States District Judge